UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

BRUCE EDWARD COMMITTE,

        Plaintiff,

   v.

OREGON STATE UNIVERSITY,

        Defendant.

Case No. 3:13-cv-01341-ST

OPINION AND ORDER

**STEWART, Magistrate Judge:**

## INTRODUCTION

Plaintiff, Bruce Committe ("Committe"), applied in July 2012 for an assistant professor position in the Accounting Department at the Cascades campus of defendant, Oregon State University ("OSU"). When OSU hired a younger person, he filed this lawsuit *pro se* alleging in his First Amended Complaint (docket #38) that OSU discriminated against him based on his age in violation of the Age Discrimination in Employment Act of 1967, 29 USC §§ 621-34 ("ADEA").

All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c) (docket #22).

1 – OPINION AND ORDER

Under FRCP 56, OSU moves for summary judgment against the First Amended Complaint (docket #48).[1] For the reasons set forth below, that motion is granted.

## STANDARDS

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law." The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986). Once the moving party does so, the nonmoving party must "go beyond the pleadings" and designate specific facts showing a "genuine issue for trial." *Id* at 324, citing FRCP 56(e). The court must "not weigh the evidence or determine the truth of the matter, but only [determine] whether there is a genuine issue for trial." *Balint v. Carson City, Nev.*, 180 F3d 1047, 1054 (9th Cir 1999) (citation omitted). A "'*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir 1989) (citation omitted), *cert. denied*, 493 US 809 (1989).

The substantive law governing a claim or defense determines whether a fact is material. *Addisu v. Fred Meyer, Inc.*, 198 F3d 1130, 1134 (9th Cir 2000) (citation omitted). The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party." *Farrakhan v. Gregoire*, 590 F3d 989, 1014 (9th Cir 2010), citing *Anderson v. Liberty Lobby, Inc.*, 477 US 242, 255 (1986). In employment discrimination cases, "very little evidence" is required to survive summary judgment "because the ultimate question is one that can only be resolved through a searching inquiry — one that is most appropriately conducted by the

---

[1] Committe asked the court to defer OSU's motion until after he filed a Second Amended Complaint. However, this court denied his Motion for Leave to File a Second Amended Complaint to add a § 1983 claim against OSU employees for denial of equal protection based on age (docket #99).

factfinder, upon a full record." *Schnidrig v. Columbia Mach., Inc.*, 80 F3d 1406, 1410 (9th Cir 1996) (internal quotations and citation omitted), *cert. denied*, 519 US 927 (1996).

## FACTS

In July 2012, OSU posted a job listing for an assistant professor at its Cascades campus ("Cascades position") in Bend, Oregon, beginning in the fall of 2013. Elston Decl. (docket #49), ¶ 3 & Ex. 1, p. 2; Committe Ex. 4.[2] The Cascades Position is a full-time, tenure-track faculty position that involves 50% teaching and developing curriculum; 40% developing and implementing "a research program that involves empirical and conceptual investigations," seeking funding to support this research, and publishing the results in "high quality peer-reviewed journals;" and 10% professional "service activities related to an accounting program with strong ties to the profession." Elston Decl., Ex. 1, pp. 1-2;[3] Committe Ex. 4. Although Committe does not recall seeing it (Kammer Decl. (docket #51), Ex. 1 ("Committe Depo."), p. 52), OSU established the following four "Minimum/Required Qualifications" for applicants:

> PhD in accounting from an AACSB accredited school or equivalent.
> Potential to publish in highly ranked accounting journals.
> Demonstrated excellence in teaching financial, managerial, or tax accounting and mentoring of students.
> A strong interest in establishing a well-respected accounting program at the branch campus.

Elston Decl., Ex. 1, p. 2.

In addition, OSU listed two "Preferred (Special) Qualifications" of professional certification and a commitment to promoting and enhancing diversity. *Id.* Applicants were instructed to submit a letter of interest; curriculum vitae; evidence of teaching effectiveness; a

---

[2] The exhibits attached to Plaintiff's Response on the Merits to Defendant's Motion for Summary Judgment (docket #83) are referred to as "Committe Ex."
[3] Committe recalls that he responded to the two-page announcement (Committe Ex. 4) which does not contain all of the information on the announcement submitted by OSU.

3 – OPINION AND ORDER

statement of their research, teaching and career goals; and contact information for four references. *Id*.

OSU assembled a hiring committee to review the applicants which consisted of: (1) Julie Elston, Associate Professor of Business at the Cascades campus, who served as the chair until she left on sabbatical in January 2013; (2) Marla Hacker, Dean of Academic Programs at the Cascades campus, who served as chair beginning in January 2013; (3) Roger Graham, an accounting professor at OSU's Corvallis campus; and (4) Jim Ellis, a business administration instructor at Central Oregon Community College ("COCC"). Elston Decl., ¶ 2; Hacker Decl. (docket #50), ¶ 2.

Committe was one of several applicants for the Cascades Position. Elston Decl., ¶ 5 & Ex. 2; Committe Depo., p. 49. At that time, he was 60 years old. Committe Depo., p. 24. In support of his application, Committe submitted his curriculum vitae listing, among other things, his research philosophy, his educational and professional background, and his publications (both published and under submission). Elston Decl., ¶ 5 & Ex. 2; Committe Depo., pp. 73-75 & Ex. 8. He also submitted four references, a chart listing information from his teaching evaluations from 1987 to 1992, a cover letter, and an unpublished research paper which outlined a new accounting theory. Elston Decl., ¶ 5 & Ex. 2; Committe Depo., pp. 48-49, 56, 58, 100-01, 104, & Exs. 4, 6 & 8. His age was not stated anywhere on his application materials. Elston Decl., ¶ 5; Committe Depo., pp. 120-23.

The Hiring Committee met in October 2012 to consider the applications and designated Dr. Elston to call Committe for a screening interview. Elston Decl., ¶ 6. Dr. Elston spoke by telephone with Committe on October 23, 2012, about his academic and professional background and took notes of their conversation. *Id*, ¶ 7 & Ex. 3; Committe Depo., pp. 124, 129-30.

According to Committe, this interview by Dr. Elston was short, lasting about 10 minutes, omitted relevant subjects, and left him with the "strong impression" that she was not interested in him, had already made up her mind, and was simply trying to get rid of him. Committe Depo., pp. 131, 135, 143, 150. She did not ask him about his research or his teaching and just basically asked if she could answer any of his questions. *Id*, pp. 135-36, 139. He asked a couple of questions about the teaching load in terms of semester language ("3/2" meaning three courses the first semester and two courses the second semester, "2/2" meaning two courses each semester, *etc.*). *Id*, pp. 132, 139. He felt that this was an unreasonable teaching load, making it impossible to do any research, but was not going to argue with Dr. Elston. *Id*, pp. 147-48, 150-51. She did not tell him that OSU was on the quarter system, but did state that the teaching load would increase after obtaining tenure which he thought was "kind of weird." *Id*, pp. 132-33, 140. He never told her he would not teach something and does not recall discussing research support, starting a new program at the Cascades campus, or living in Bend. *Id*, p. 134.

In contrast, Dr. Elston recalls asking Committe whether he had ever started a new department, and he stated that he had not. Elston Decl., ¶ 7, Ex. 3. She explained that the Cascades Position would most likely have a higher teaching load than similar positions at most other schools, even OSU's Corvallis campus, but would be somewhat negotiable. *Id*, ¶ 8. Committe responded that he can teach anything except systems, but could not prepare four or five different classes. *Id*, Ex. 3. Finally, when Dr. Elston asked plaintiff why he was interested in the Cascades Position, he stated that he did not "like the humid Florida" where he was currently living and felt "he's an academic underneath it all." *Id*. Committe described his theory of Human Action Accounting, explained that he "can't prevent himself from doing research," and made clear that he wanted to focus on research when he said that he has a "commitment to

5 – OPINION AND ORDER

[his] work that is above that to [his] employer." *Id*, ¶ 9 & Ex. 3. Based on their conversation, Dr. Elston understood that Committe did not believe the Cascades Position was a good fit for him. *Id*, ¶ 10. However, for purposes of OSU's motion, this court will view the facts in the light most favorable to Committe and accept his recollection of his screening interview with Dr. Elston.

On October 25, 2012, Committe sent an e-mail to Ilene Kleinsorge, the Dean of OSU's College of Business. Committe Depo, pp. 143-44 & Ex. 2. He asked her to confirm the information provided by Dr. Elston that "the standard teaching load for that position is 3/2 with each of these five classes a different preparation" and that "upon any promotion to full professor the teaching load becomes 3/3." Committe Depo. p. 145 & Ex. 2, p. 2. Dean Kleinsorge emailed Committe the same day clarifying that that the Cascades campus administration "has the authority to assign teaching loads to meet their needs," that OSU is on a quarter system, and that the typical teaching load for assistant professors is to teach four courses the first year and five courses the second year (2/1/1/1) and thereafter. Committe Depo., Ex. 2, p. 1. She added: "I don't know what the needs will be nor your expertise" and reiterated that the Cascades campus administration is at "liberty to set their own loads." *Id*. Committe responded that this information was different than Dr. Elston gave in the screening interview and that he had the "overall impression" that the screening interview was intended to get rid of him as a candidate. *Id*. He had no other contact with Dean Kleinsorge after this e-mail exchange. Committe Depo., pp. 158-59.

After the initial screening interviews, the Hiring Committee met to discuss the candidates. Hacker Decl., ¶ 3. Based on the information in Committe's application materials and screening interview, the Hiring Committee determined that he did not meet the minimum

6 – OPINION AND ORDER

qualifications for the Cascades Position.  *Id*, ¶ 4; Elston Decl., ¶ 13.  First, it concluded that Committe had not demonstrated sufficient teaching excellence.  Hacker Decl., ¶ 5; Elston Decl., ¶ 13.  He had not taught accounting or any other subject for 20 years.  Hacker Decl., ¶ 5; Committe Depo., pp. 42-43.  From 1992 to 2011 he practiced as an attorney specializing in trial and appellate litigation.  Elston Decl., Ex. 2, p. 4; Committe Depo., pp. 30-33.  The only document submitted to demonstrate his teaching excellence was a chart related to his teaching evaluations from 1987 to 1992.  Elston Decl., Ex. 2, p. 13; Hacker Decl., ¶ 5; Committe Depo, pp. 104-13.  The chart listed the classes he had taught and the percentages of grades 4 and 5 that he had received on his evaluations, but did not include any student comments.  Hacker Decl., ¶ 5; Committe Depo, pp. 106-08.

Second, the Hiring Committee concluded that Committe had not demonstrated the potential to publish original research in "highly ranked accounting journals."  Hacker Decl., ¶ 6; Elston Decl., ¶ 13.  According to his curriculum vitae, he had published articles before 1994.  Elston Decl., Ex. 2, pp. 6-7.  But since then, he had published only opinion pieces in the International Journal of Critical Accounting, a journal that has been in publication only since 2009 and that was rated "C" on the Australian Business Deans Council ("ABDC") 2010 Rating of Journal Quality List, which is widely used by accounting academics to assess journal quality.  Hacker Decl., ¶¶ 6-7 & Ex. 1, p. 17.

In addition, the Hiring Committee considered that he had told Dr. Elston that he had never participated in starting a new accounting program and did not want to have the teaching load required at the Cascades campus.  Hacker Decl., ¶¶ 8-9.  At no time did the Hiring Committee ever discuss Committe's age or the age of the other applicants.  Elston Decl., ¶ 15; Hacker Decl., ¶ 23.

7 – OPINION AND ORDER

In November 2012, OSU informed Committe that he was no longer being considered for the Cascades Position. Elston Decl., ¶ 14.

The Hiring Committee narrowed down the candidates for the Cascades Position to two individuals, conducted videoconference interviews of the finalists, and then invited both finalists to campus for in-person interviews. Hacker Decl., ¶ 11.

One of the finalists was Dr. Susan McMahon. *Id*, ¶ 12. From 2010 to 2012, Dr. McMahon was an assistant professor of accounting at Texas Christian University ("TCU") where she had served on academic and administrative committees. *Id*, ¶¶ 12-13, 17 & Ex. 2, p. 3. In support of her application for the Cascades Position, she submitted multiple teaching evaluations with student comments and scores that demonstrated that she was very highly regarded by her students. *Id*, ¶ 12 & Ex. 2, pp. 6-43. She also submitted a detailed statement of her teaching strengths and goals that discussed both her skill in teaching across many subjects and also her skill connecting with students of all levels. *Id*, ¶ 12 & Ex. 2, p. 46. The Hiring Committee determined that Dr. McMahon's teaching interests aligned with the teaching requirements of the Cascades Position and exhibited more relevant teaching experience and interests than Committe. *Id*, ¶¶ 13-14.

The Hiring Committee also determined that, unlike Committe, Dr. McMahon demonstrated her potential to publish original research in a high-quality journal. *Id*, ¶ 15. She had a working paper under review at the Accounting Review, a journal rated "A*" by the ABDC, had presented at two accounting conferences, and had other original research underway at TCU. *Id.* Additionally, Dr. McMahon had served on several academic and administrative committees at TCU, had previously lived in Oregon for almost a decade, had an interest in returning, and expressed an interest in developing new programs and curriculum at OSU. *Id*, ¶¶ 17-19. She

also had academic credentials that were impressive to the Hiring Committee, including that she received her post-doctorate degree from the University of Utah, a school it regarded very highly, and studied under an adviser who was well respected in the accounting field. *Id*, ¶ 20.

After the hiring process was complete, OSU offered the Cascades Position to Dr. McMahon on January 24, 2013. *Id*, ¶ 22. At that time, Dr. McMahon was 48 years old. Committe Ex. 2, p. 2.

## DISCUSSION

### I. ADEA Standards

Under the ADEA, an employer may not "refuse to hire . . . any individual [who is at least 40 years old] . . . because of such individual's age." 29 USC § 623(a)(1). To prove age discrimination under a disparate-treatment theory, a plaintiff has the burden to establish by a preponderance of the evidence (whether direct or circumstantial) that the adverse employment action taken against him would not have occurred had he been under 40 years old. *See Gross v. FBL Fin. Servs.*, 557 US 167, 180 (2009). Producing evidence that age was merely one reason not to hire a plaintiff is not sufficient; a plaintiff must prove that "age was the reason" for the action. *Id* at 176 (internal quotation marks and citation omitted).

An ADEA plaintiff can survive a motion for summary judgment either by producing: (1) direct evidence of discrimination sufficient to prove the employer's discriminatory animus without inference or presumption; or (2) circumstantial evidence within the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 US 792, 802 (1973). *See Shelley v. Geren*, 666 F3d 599, 607-08 (9th Cir 2012) (*McDonnell Douglas* burden-shifting applies to summary judgment evaluation of age discrimination claims post-*Gross*). Without direct evidence of a discriminatory motive, the plaintiff may establish a *prima facie* case by

showing that: (1) he is a member of the class protected by the ADEA; (2) he was satisfactorily qualified for the position for which he was applying; (3) he was not hired; and (4) the position was filled by a substantially younger employee with equal or inferior qualifications. *Id*; *Cotton v. City of Alameda*, 812 F2d 1245, 1248 (9th Cir 1987) (outlining the elements of an ADEA claim in a failure to hire case).

If the plaintiff is able to establish a *prima facie* case of age discrimination, a presumption of discriminatory intent is created, and the burden of production shifts to the defendant to rebut that presumption. *Shelley*, 666 F3d at 607-08. If the employer defendant is able to produce evidence that its decision was made for legitimate, nondiscriminatory reasons, the burden shifts back to the plaintiff to produce evidence that the employer's proffered reason was pretextual. *Id*.

## II.     *Prima Facie* Case

The members of the Hiring Committee deny ever considering age in assessing the candidates for the Cascades Position. Elston Decl., ¶ 15; Hacker Decl., ¶ 23. Nevertheless, as Committe points out, the Hiring Committee still had a pretty good idea of his age based on the fact that he taught accounting for 13 years until l992. Committee Depo., pp. 122-23. However, direct evidence requires more than mere knowledge of a person's age.

"Direct evidence, in the context of an ADEA claim, is defined as 'evidence of conduct or statement by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude.'" *Enlow v. Salem-Keizer Yellow Cab Co., Inc.*, 389 F3d 802, 812 (9th Cir 2004), quoting *Walton v. McDonnell Douglas Corp.*, 167 F3d 423, 426 (8th Cir 1999). Or, stated more succinctly, "'[d]irect evidence is evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption.'" *Godwin v. Hunt Wesson, Inc.*, 150 F3d 1217, 1220 (9th Cir 1998) (alteration in original), quoting *Davis v.*

*Chevron, U.S.A., Inc.*, 14 F3d 1082, 1085 (5th Cir 1994). Such direct evidence is a statement, admission, or other unmistakable indication that age was the determining factor for the decision. *See e.g.*, *EEOC v. Manville Sales Corp.*, 27 F3d 1089, 1094-95 (5th Cir 1994) ("old man," "old and inflexible" and "incapable"); *Corbin v. Southland Int'l Trucks*, 25 F3d 1545, 1548-49 (11th Cir 1994) ("At your age you cannot produce like you once could, and we are going to have to make some kind of adjustment"); *McDonald v. Union Camp Corp.*, 898 F2d 1155, 1161-62 & n3 (6th Cir 1990) (older employee told he "could be cheaply replaced with a younger salesman"). In contrast, a "stray remark" that is "uttered in an ambivalent manner and [is] not tied directly to [the plaintiff]'s termination" is insufficient to create an inference of discriminatory motive. *Nesbit v. Pepsico, Inc.*, 994 F2d 703, 705 (9th Cir 1993), citing *Merrick v. Farmers Ins. Grp.*, 892 F2d 1434, 1434 (9th Cir 1990). Committe has presented no discriminatory statements by OSU that rise to the level of direct evidence of age discrimination.

Absent direct evidence, Committe must rely on circumstantial evidence to meet his burden of proving a *prima facie* case of age discrimination. It is undisputed that he was 60 years old when he applied and was not hired. However, OSU argues that he cannot prove either of the other two elements of a *prima facie* case, namely that he was qualified for the Cascades Position and that OSU filled the Cascades Position with a substantially younger applicant with equal or inferior qualifications.

The Hiring Committee determined that Committe was not minimally qualified for the Cascades Position because he had not: (a) demonstrated excellence in teaching; or (b) shown potential to publish in highly ranked journals. Elston Decl., ¶ 13; Hacker Decl., ¶¶ 4-7. It also considered Dr. Elston's reports that he had never participated in starting a new accounting program. Hacker Decl., ¶ 8. Committe argues that this determination is simply not credible given

his credentials, including a Ph.D. and J.D., the breadth of his prior teaching experience and his research accomplishments.

Based on his application materials, Committe taught a variety of undergraduate and graduate accounting courses for 12 years, had published research articles, had research in progress or planned, and had made presentations at conferences. He was not disqualified based solely on his application materials, but was one of the few deemed sufficiently interesting to the Hiring Committee to proceed to the next step of a screening interview. As of October 17, 2012, OSU had received only six applicants for the Cascades Position. Committe Ex. 9, pp. 9-10. By November 5, 2012, that list appears to have grown to about 10 applicants. *Id*, p. 2. Of those candidates, it appears that at least one was disqualified immediately and that only three, including Committe, was contacted for a screening interview. *Id*, pp. 5, 7, 9. Therefore, the Hiring Committee's decision not to hire him presumably was based largely on the screening interview.

Committe disputes Dr. Elston's recollection of his telephone screening interview and asserts that, out of a desire to scuttle his application, she did not ask him pertinent questions and misled him as to the teaching load required. The Hiring Committee relied on Dr. Elston's report of her interview and, if one believes Committe, made its decision based on age-based criteria rather than on his failure to meet the minimum qualifications. Those "Minimum/Required Qualifications" incorporate subjective judgments on which reasonable people may disagree. Unlike Dr. McMahon, Committe did have substantial teaching experience and did invent and publish a new accounting theory. The Hiring Committee rejected him, at least in part, due to the lack of his recent teaching experience which is related directly to his age. This is sufficient to meet the very low burden of proof required to satisfy a *prima facie* case.

///

12 – OPINION AND ORDER

### III.    Legitimate Nondiscriminatory Reasons

OSU has submitted evidence to support a legitimate nondiscriminatory reason for choosing not to hire Committe, namely his failure to meet the minimum qualifications for the Cascades Position. Instead, it selected Dr. McMahon because it determined that she was better qualified for the job.

It is undisputed that Committe had not taught for 20 years and had been out of the accounting profession altogether since 1992. This lack of recent teaching experience was a concern to the Hiring Committee which preferred someone who could teach a heavy course load and spend at least half of his or her time teaching, developing curriculum, and mentoring students. Hacker Decl., ¶ 5. Even though Committe had 12 years of teaching experience in a variety of accounting courses, the Hiring Committee could reasonably conclude that he did not demonstrate the "excellence in teaching" that it sought. *See* Elston Decl., ¶ 13. Committe submitted a summary of teaching evaluations for only the last five years that he taught (1987-1992). Committe Ex. 11. Although that may be the most relevant time period, the evaluations showed that in all but two classes over that five-year period, Committe had received more low grades (1, 2, 3) than high grades (4 and 5). Committe Depo., pp. 106-08. That summary contained no written feedback from his prior students.

Dr. McMahon only had two years of recent teaching experience in accounting at TCU. Hacker Decl., ¶¶ 12-13 & Ex. 2, p. 3. However, in contrast to Committe, she submitted impressive teaching evaluations showing that her students appreciated her as an instructor. *Id*, ¶¶ 12-13 & Ex. 2, pp. 6-43. Her application also included a lengthy description of her teaching philosophy showing that she had a passion for teaching and an aptitude for instruction in the areas needed at the Cascades campus. *Id*, Ex. 2, p. 46. As compared to Committe,

13 – OPINION AND ORDER

Dr. McMahon exhibited more relevant teaching skills and interests. *Id*, ¶ 14. She had also consistently been involved with the accounting profession, either in practice or in academics, since 1989 and had not taken a lengthy hiatus as Committe had done. *Id*, ¶ 12 & Ex. 2, pp. 3-5. This contrast provides a legitimate nondiscriminatory reason for the Hiring Committee's conclusion.

Further, the Hiring Committee was led to believe that Committe prioritized his research over teaching responsibilities. As stated in his cover letter: "My research program is very important, and I seek a research recognition teaching load." Elston Decl. Ex. 2, p. 3; Committe Depo., p. 60. As he later testified, he was "happy to see that research was almost one-half of the job," indicating that it would "have a research-oriented university teaching load." Committe Depo., p. 54. Although he disputes that Dr. Elston accurately conveyed the anticipated teaching load to him, he does not and cannot dispute that he prioritized research over teaching. Even if he would have taught the course load and subjects set by the Cascades campus administration, he never conveyed that willingness to the Hiring Committee.

The Hiring Committee also has submitted evidence to support its conclusion that Committe lacked the "potential to publish research in highly ranked accounting journals." Committe's resume showed that he had not conducted original accounting research for about 18 years. He also does not dispute that his 2011 article was published by the International Journal of Critical Accounting, a practitioner journal that started in 2009 and was rated "C" by the ABDC. Similarly, the three articles that he had under submission were all with that same "C" ranked journal. The fourth item that he listed being "under submission" is a poem entitled "Accounting for Human Action: What It Is." Elston Decl., Ex. 2, p. 7. In addition, his "in progress or planned" research consisted of treatises and certain opinion pieces with no indication

14 – OPINION AND ORDER

as to where he intended to submit them for publication. And while he had published certain other accounting articles in the 1990s, at the time of his application, he had submitted all his work, aside from a poem, to the same "C" ranked journal.

In contrast, Dr. McMahon showed potential to have original research published in a high-quality academic journal. At the time of her application to OSU, Dr. McMahon had a paper based on original research in the review stage at the *Accounting Review*, a journal that was ranked "A*" by the ABDC and had been in circulation since 1926. Hacker Decl., ¶ 15. She had presented her research at two accounting profession conferences, another accomplishment that was sought in the job posting. *Id*. She also had other original research underway at TCU. *Id*. In comparison with Committe, Dr. McMahon was conducting original research in established areas of accounting. *Id*, ¶ 16.

Finally, the Hiring Committee has submitted evidence that Committe failed to demonstrate a "strong interest in establishing a well-respected accounting program" at the Cascades campus or even in moving to Oregon. His application materials make no mention of starting a new program or why he wished to move to Oregon from Florida.[4]

In contrast, Dr. McMahon's application exhibited interest in helping to develop the accounting program at the Cascades campus in the career goals section of her application materials. *Id*, ¶ 12, Ex. 2, p. 47. Dr. McMahon expressed interest in developing new programs and curriculum and explained that she had already gained similar experience at TCU. *Id*, ¶¶ 12, 17 & Ex. 2, p. 44. She expressed a strong personal interest to return to Bend, Oregon, and explained that she felt the growing Cascades campus was an ideal fit for her personally and professionally. *Id*, ¶¶ 12, 18 & Ex. 2, p. 44. Thus, the Hiring Committee could reasonably

---

[4] In fact, since January 2009 Committe has applied to approximately 100 similar positions at four-year institutions of higher education across the country. Kammer Decl., ¶ 3 & Ex. 2, p. 3 (Plaintiff's Response to Defendant's First Set of Interrogatories, ¶ 3).

15 – OPINION AND ORDER

conclude that Dr. McMahon showed more interest in becoming a faculty member at the Cascades campus than did Committe.

Based on this evidence, OSU had a legitimate nondiscriminatory reason for not hiring Committe, namely that he failed to meet three of the four "Minimum/Required Qualifications" for the Cascades Position.

## IV.    Evidence of Pretext

Committe argues that OSU's explanation for not hiring him is unworthy of credence and simply a pretext to cover up age discrimination.  *See Ford v. Varian Assocs.*, 892 F2d 1045, 1045 (9th Cir 1989), quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 US 248, 256 (1981) ("A plaintiff can show pretext either by evidence that a discriminatory reason was more likely to have motivated the employer, or by evidence that the explanation offered is 'unworthy of credence.'").  However, to avoid summary judgment, he must offer "'specific, substantial evidence of pretext.'"  *Coleman v. Quaker Oats Co.*, 232 F3d 1271, 1282 (9th Cir 2000), quoting *Wallis v. J.R. Simplot Co.*, 26 F3d 885, 889 (9th Cir 1994); *Godwin*, 150 F3d at 1220-21 ("We have held, clearly, that a plaintiff at the pretext stage must produce evidence in addition to that which was sufficient for [his] prima facie case in order to rebut the defendant's showing.").  In other words, he must do more than establish a *prima facie* case and deny the credibility of OSU's witnesses.  *See Wallis*, 26 F3d at 890.  Committe has failed to present any evidence of pretext at all, let alone specific and substantial evidence.

First, Committe argues that OSU has a written policy of intentionally lying to all accounting faculty job applicants, except the one selected, that they were not chosen because they did not meet the minimum standards for the job.  Committe Ex. 9, p. 17.  He further reasons that because of this alleged policy, OSU should not be believed.  However, OSU has submitted

16 – OPINION AND ORDER

evidence that no applicants for the Cascades position received the "fail message" referred to by Committee. Sim Decl. (docket #89), ¶¶ 2-3.[5] Instead, OSU uses the "fail message" only if rejects an applicant based on the disqualifying questions for a position. *Id.* If an applicant submits a disqualifying response to such a question (such as whether the applicant attained a specified level of education), then the applicant receives the "fail message" at the time of submitting the application. *Id.* However, disqualifying questions are rarely used for faculty positions and were not utilized in connection with the Cascades position. *Id.*

Second, Committe argues that Dr. Elston was "trying to get rid of" him during the screening interview. Committe felt the interview was very short and did not cover many topics. However, he admits that he did not keep notes of the conversation and cannot remember exactly what was discussed. Committe Depo., pp. 131, 135. Additionally, a screening interview is intended to be shorter than the full interview granted to finalists. Elston Decl., ¶ 6. In fact, if OSU had wanted to get rid of him, then it would not have held a screening interview.

Committe also argues that the fact that Dr. Elston and Dean Kleinsorge gave him different information about the teaching course load shows that Dr. Elston was improperly trying to eliminate him from consideration. This argument fails for several reasons. First, Committe acknowledges that he and Dr. Elston could have simply misunderstood one another. Committe Depo., pp. 132-33, 142. He also admits that Dr. Elston never told him that OSU was on a semester system; he simply made that assumption. *Id*, pp. 131-32. Second, the information provided by Dean Kleinsorge did not contradict the information provided by Dr. Elston. She confirmed that the teaching load for assistants at the Cascades campus was four classes in the first year and five classes thereafter, which was consistent with Dr. Elston's purported

---

[5] After OSU submitted this declaration of Robbin Sim, Committe was permitted to take the deposition of Ms. Sim (docket #106), which he did (docket #112), and to supplement the record, which he did not.

17 – OPINION AND ORDER

statement to Committe that the teaching load would be five classes. *Id*, Ex. 2, p. 1; Elston Decl., ¶ 8. Dean Kleinsorge also noted in her email that the "Cascades campus has the authority to assign teaching loads to meet their needs." Kammer Decl., Ex. 1. The Kleinsorge email is not specific and substantial evidence of pretext. Instead, it is nothing more than a university dean's articulation of her understanding of an accounting professor's course load at a branch campus, which happened to be entirely consistent with what Committe reports Dr. Elston told him.

Committe also argues that what Dr. Elston allegedly told him about the teaching load made no sense in light of OSU's job announcement to the effect that the position required 50% teaching and 40% research duties. He argues further that Dean Kleinsorge's e-mail was much more consistent with his own understanding of what the course load would be to approximate the 50% teaching and 40% research duties. But again, Dean Kleinsorge's e-mail is in no way inconsistent with what Dr. Elston purportedly told Committe. Committe's argument about the expected course load relative to the percentage of advertised teaching duties is pure speculation and not evidence of pretext.

Committe cannot survive summary judgment by arguing that the Hiring Committee used the wrong evaluation criteria. *Coleman*, 232 F3d at 1285 ("While a subjective evaluation system can be used as cover for illegal discrimination, subjective evaluations are not unlawful per se and 'their relevance to proof of a discriminatory intent is weak.'"), quoting *Sengupta v. Morrison-Knudsen Co.*, 804 F2d 1072, 1075 (9th Cir 1986). The ADEA does not make it unlawful for an employer to do a poor job of selecting employees, as long as age was not a consideration in the hiring process. *Cotton*, 812 F2d at 1249; *see also Coleman*, 232 F3d at 1285 ("That [the employer] made unwise business judgments or that it used a faulty evaluation system does not

support the inference that [the employer] discriminated on the basis of age."). The question is not whether Committe in the abstract had better qualifications than Dr. McMahon, but whether Dr. McMahon was more qualified with respect to the criteria that OSU actually employed. *See Coleman*, 232 F3d at 1285; *see also Robinson v. Pierce Cnty.*, 539 F Supp2d 1316, 1329 (WD Wash 2008) (plaintiff failed to offer evidence disputing that the hired candidates' qualifications exceeded his).

Committe's unsupported opinion that he was better qualified for the Cascades Position than Dr. McMahon is insufficient to show that OSU had a discriminatory motive when it chose not to hire him and does not raise an issue of material fact. *See Prukop v. King Cnty. Sheriff*, 412 F App'x 38, 38 (9th Cir 2011) (holding that the district court properly granted summary judgment in favor of the employer because plaintiff failed to offer evidence "apart from his unsupported opinion" as to whether he was qualified for the position he sought); *Lee v. Solano Cnty. Prob. Dep't*, 237 F App'x 184, 185 (9th Cir 2007); *Coleman*, 232 F3d at 1285 (internal punctuation and citation omitted) (plaintiff's "subjective personal judgments of his competence alone do not raise a genuine issue of material fact.").

In sum, Committe has not submitted the requisite specific and substantial evidence necessary to establish pretext. No reasonable fact-finder could find that OSU's explanation for its hiring decision was pretextual and made for discriminatory reasons.

///

///

///

///

///

## **ORDER**

For the reasons set forth above, OSU's Motion for Summary Judgment against the First Amended Complaint (docket #48) is GRANTED.

DATED  May 8, 2015.

s/ Janice M. Stewart<br>
Janice M. Stewart<br>
United States Magistrate Judge